IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TREONDOUS ROBINSON,                    )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )            Case No.    18-cv-86-RJD
                                       )
LAMB, DR. AHMED, CUNNINGHAM,           )
SHERRY BENTON, OFFICER KINK, JOHN )
R. BALDWIN, BROOKHART, and RITZ,       )
                                       )
        Defendants.                    )

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

Plaintiff Treondous Robinson, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Lawrence Correctional Center.   Plaintiff alleges he was provided inadequate medical care for recurring nasal polyps and sinus infections.   Plaintiff proceeds in this action on his Second Amended Complaint, which sets forth the following claims:

> Count One:    Eighth Amendment deliberate indifference claim against Dr. Ahmed for continuing to treat Plaintiff's nasal polyps and sinus infections with medication that was not effective to relieve his painful symptoms, and for failing to refer Plaintiff to an outside specialist.

> Count Two:    Eighth Amendment deliberate indifference claim against Cunningham, Lamb, and Benton for failing to intervene to obtain effective treatment for Plaintiff's conditions, after Plaintiff informed them numerous times between July 2016 and late 2017 that Dr. Ahmed's treatment was not working.

> Count Three: Eighth Amendment deliberate indifference claim against Kink, Baldwin, and Brookhart for failing to intervene and obtain effective treatment for Plaintiff's conditions after receiving notice of the same by way of grievance filings.

Page **1** of **27**

Count Four:   Eighth Amendment deliberate indifference claim against Dr. Ritz for denying Dr. Trost's recommendations for referrals to outside specialists to treat Plaintiff's nasal polyps and sinus infections.

This matter is before the Court on Defendants' Motions for Summary Judgment (Docs. 116, 125, and 129).   Plaintiff has responded to the motions (Docs. 123, 133, and 134).   For the reasons set forth below, the Motions are **GRANTED**.

<u>**Factual Background**</u>

***Plaintiff's Medical Treatment***

Plaintiff was first diagnosed with asthma in 2011 and began attending asthma chronic care clinics when he transferred to Lawrence Correctional Center ("Lawrence") around 2016 (Deposition of Treondous Robinson, Doc. 132 at 6).   Plaintiff began having issues with his sinuses in 2013 or 2014 (Doc. 132 at 6).   Plaintiff was first diagnosed with nasal polyps[1] in 2016 (Doc. 132 at 6; *see* Plaintiff's Medical Records, Doc. 130-1 at 13).   On March 17, 2016, Dr. Trost submitted Plaintiff's case to collegial review for an ENT consult for chronic sinusitis (*see* Doc. 123 at 28).   On March 29, 2016, Plaintiff's case was presented by Dr. Trost in collegial review with Defendant Dr. Ritz (Doc. 117-1 at ¶ 8).   The request was denied, and an alternative treatment plan was developed for the site to provide more information, including current medications/copy of Plaintiff's medication administration record, symptoms, and an exam (*Id.*; *see* Doc. 123 at 31). Plaintiff's case was not re-presented until August 2017 (Doc. 117-1 at ¶ 9).

Following Plaintiff's nasal polyp diagnosis in 2016, Plaintiff was seen on at least six

---

[1] Nasal polyps are soft, painless, noncancerous growths on the lining of the nasal passages or sinuses (Affidavit of Faiyaz Ahmed, MD, Doc. 126-1 at ¶ 13).   They result from chronic inflammation and are associated with asthma, allergies, recurring infection, drug sensitivity or certain immune disorders (*Id.*).   The first course of treatment for nasal polyps is medications, including nasal corticosteroids (e.g. Nasacort), oral corticosteroids (e.g. Prednisone), or medications to treat the conditions that contribute to long-term swelling in sinuses, including long-term and quick-relief inhalers to treat asthma, saline nasal spray and antihistamines to treat allergic rhinitis, and antibiotics to treat chronic or recurring infection (*Id.*).   These conditions can be difficult to treat, and usually require long-term treatment that tackles the symptoms that trigger swelling (*Id.* at ¶ 70).

occasions for complaints of nasal polyps or nasal congestion through June 2017, and was prescribed various medications, including Claritin, Singular, and Nasacort (*see* Doc. 130-1 at 14, 15, 29, 37,38, 44).   On June 6, 2017, Plaintiff was seen by a nurse for complaints of pus coming out of his nose (*Id.* at 50).   Plaintiff indicated he was using nasal sprays, but they were not working (Affidavit of Faiyaz Ahmed, MD, Doc. 126-1 at ¶ 6; *see* Doc. 130-1 at 50).   On nasal examination, the nurse observed obstruction on the right side and swelling (*Id.*).   The nurse's plan was to refer Plaintiff to a doctor (*Id.*).   Defendant Dr. Ahmed first saw Plaintiff on that same day, June 6, 2017 (Doc. 126-1 at ¶ 7; *see* Doc. 130-1 at 48).   Dr. Ahmed noted Plaintiff's right nostril was red and tender (*Id.*).   Dr. Ahmed's plan was to culture and test the sensitivity of the pus, and provide Bactrim (an antibiotic), Tylenol, and dressing changes every day until it healed (*Id.*). According to Plaintiff's Medication Administration Record, on or about June 17, 2017, a nurse charted that Plaintiff's postule was "healed" (Doc. 126-1 at ¶ 8; *see* Doc. 126-1 at ¶ 8).

Dr. Ahmed saw Plaintiff again on June 29, 2017 for complaints of tightness in his chest, asthma, and nasal congestion (Doc. 126-1 at ¶ 9; *see* Doc. 130-1 at 60).   Dr. Ahmed's assessment of Plaintiff was chronic asthma and chronic allergic rhinitis (inflammation of the inside of the nose caused by an allergen) (*Id.*).   Plaintiff's blood oxygen level was normal, and Dr. Ahmed noted Plaintiff's nasal mucosa was pale and boggy, and he had mild expiratory wheezing, but was in no respiratory distress (*Id.*).   Dr. Ahmed discontinued Afrin nasal spray (nasal decongestant) and Prednisone (corticosteroid), and prescribed Alvesco (a steroid inhaler that prevents asthma attacks) for six months, and saline nasal spray for six months (*Id.*).   Plaintiff was to continue with a Xopenex inhaler (bronchodilator) (*Id.*).   Plaintiff next saw Dr. Ahmed for complaints related to his sinuses on July 19, 2017 (Doc. 126-1 at ¶ 11; *see* Doc. 130-1 at 64).   Dr. Ahmed noted Plaintiff's mucosa was pale and boggy (*Id.*).   Dr. Ahmed also noted inferior turbinate

hypertrophy, and explains that turbinate hypertrophy is due to an enlargement of the turbinates, which are located inside the nose on either side of the nasal septum (*Id.*).   Dr. Ahmed prescribed Nasacort (nasal corticosteroid) for one year, Claritin (antihistamine) for one year, and Prednisone for two weeks (*Id.*).   Dr. Ahmed also wrote a new prescription for saline nasal spray for six months (*Id.*).

Plaintiff was next seen by Dr. Ahmed on August 1, 2017 for complaints of nasal polyps and difficulty breathing through the nose (Doc. 126-1 at ¶ 12; *see* Doc. 130-1 at 67).   Dr. Ahmed noted Plaintiff's nasal mucosa was pale and boggy, and there was interior turbinate hypertrophy (*Id.*).   Dr. Ahmed charted that Plaintiff wanted an ENT referral, and "refused treatment here." (*Id.*).   Dr. Ahmed's plan was to continue the trial of Nasacort, with reassurance it takes time to get better, and an ENT referral for a possible polypectomy (*Id.*).   On August 3, 2017, Dr. Ahmed submitted a referral request to Wexford for Plaintiff to be evaluated by an ENT for a possible polypectomy (Doc. 126-1 at ¶ 14; *see* Doc. 133 at 33).   The referral request was discussed in collegial review with Defendant Dr. Ritz, a Wexford Utilization Management physician, on August 10, 2017 (Doc. 126-1 at ¶ 15).   Dr. Ritz did not agree to the requested services and, along with Dr. Ahmed, an alternative treatment plan was agreed upon, including: (1) 2-3 months of "directly observed" Nasacort, Claritin; and (2) Re-present as needed after this time period (Doc. 126-1 at ¶ 15; Declaration of Stephen J. Ritz, D.O., CCHP, Doc. 117-1 at ¶ 10; *see* Doc. 117-2 at 22).   Dr. Ahmed explains that "directly observed" therapy is a method of drug medication administration in which a health care professional watches a person take each dose of a medication to ensure patients are taking their medication (Doc. 126-1 at ¶ 15).   Dr. Ritz further explains that a first line treatment in an effort to relieve symptoms of nasal polyps are topical steroid sprays (Nasacort) and oral antihistamines (Claritin) (Doc. 117-1 at ¶ 11).   Additionally, treatment should

be directly observed to verify adherence and to monitor for effectiveness (*Id.*).

Dr. Ahmed saw Plaintiff again for complaints of nasal polyps on August 28, 2017 (Doc. 126-1 at ¶ 17; *see* Doc. 130-1 at 68).   Dr. Ahmed's assessment of Plaintiff was allergic rhinitis with nasal polyps (*Id.*).   Dr. Ahmed's plan was Sudafed (decongestant) for six weeks, Claritin for six months, Prednisone for seven days, and saline nasal spray for one year (*Id.*).   Dr. Ahmed discontinued Sudafed on September 11, 2017 (Doc. 126-1 at ¶ 18; *see* Doc. 130-1 at 68).   Dr. Ahmed saw Plaintiff again on September 20, 2017, wherein Plaintiff complained about his asthma (Doc. 126-1 at ¶ 21; *see* Doc. 130-1 at 73).   On examination, Dr. Ahmed noted Plaintiff's mucosa was pale and boggy, and he had mild wheezing bilaterally with no respiratory distress (*Id.*).   Dr. Ahmed assessed Plaintiff's condition as mild asthma exacerbation with bronchitis (*Id.*).   Dr. Ahmed ordered DuoNeb (a combination of two bronchodilators) for four weeks, Z-pak (antibiotics), Prednisone for five days, and for Plaintiff to return to the clinic in four weeks (*Id.*). Plaintiff was to continue with Alvesco, but his Xopenex prescription had expired (*Id.*).

Dr. Ahmed saw Plaintiff again on September 22, 2017 for complaints of recurring nasal polyps, and Dr. Ahmed planned on referring Plaintiff to an ENT (Doc. 126-1 at ¶ 22; *see* Doc. 130-1 at 76).   Dr. Ahmed's ENT referral was submitted on or about that same date, and was discussed again in collegial on September 28, 2017 with Dr. Ritz (Doc. 126-1 at ¶¶ 23-24; Doc. 117-1 at ¶ 12; *see* Doc. 130-1 at 78).   During the collegial review with Dr. Ahmed and Dr. Ritz, Plaintiff's Medication Administration Record was reviewed, and they found that Claritin and Nasacort were prescribed to Plaintiff but were not being directly observed as previously agreed (Doc. 126-1 at ¶ 24; Doc. 117-1 at ¶ 12).   Accordingly, it was agreed that the previous alternative treatment plan would be continued (*Id.*).   On October 31, 2017, Dr. Ahmed ordered directly observed treatment of Claritin, and two sprays of Nasacort in each nostril after cleaning with saline

for Plaintiff (Doc. 126-1 at ¶ 27).

According to Medical Service Refusal forms, Plaintiff either did not show up or refused his daily doses of Claritin every day in November 2017 except November 3 and 28 (Doc. 126-1 at ¶ 31; *see* Doc. 130-1 at 207), and Plaintiff either did not show up or refused his Nasacort on November 6, 11, 12, 14, 15, 19, 20, 21, 24, 28, 29, and 30, 2017 (Doc. 126-1 at ¶ 32; *see* Doc. 130-1 at 153, 209).   Records also show Plaintiff refused his daily doses of Claritin every day in December 2017 (Doc. 126-1 at ¶ 35; *see* Doc. 130-1 at 211), and either did not show or refused Nasacort on December 1, 2, 4, 9, 10, 11, 12, 14, 15, 16, 17, 18, 22, 30, and 31 (Doc. 126-1 at 36). Plaintiff also either did not show or refused his daily doses of Claritin on January 2, 3, 4, 5, 6, 7, and 10, 2018 (Doc. 126-1 at ¶ 37; *see* Doc. 130-1 at 213).   Dr. Ahmed discontinued Plaintiff's order for Claritin on January 10, 2018 because he was not taking it (Doc. 126-1 at ¶ 38; *see* Doc. 130-1 at 93).   Plaintiff's Medication Administration Records evidence he did not show up or refused to take Nasacort numerous times in January and February 2018 (Doc. 126-1 at ¶¶ 39-40). Dr. Ahmed discontinued Plaintiff's order for Nasacort on February 11, 2018 because he was not taking it (Doc. 126-1 at ¶ 41).   Plaintiff disputes the contention he refused Nasacort or Claritin, testifying that he was never placed on the med line to be observed taking Nasacort or Claritin, and that any refusal forms were not signed by him (Doc. 132 at 19).   Plaintiff also disputes that Dr. Ahmed discontinued his Nasacort due to Plaintiff's purported refusals to take it, asserting the prescription for the same was discontinued due to Plaintiff's repeated complaints regarding its ineffectiveness (*Id.* at 20).

Dr. Ahmed saw Plaintiff on February 26, 2018 for complaints of blisters in his armpit area, sinuses, polyps, and asthma (Doc. 126-1 at ¶ 42; *see* Doc. 130-1 at 96).   Dr. Ahmed noted pustular swelling in mostly the left axilla (armpit), nose polyps, pharynx post-nasal drip, no sinus

tenderness, and expiratory wheeze.   Dr. Ahmed's assessment was hidradenitis left axillia, allergic rhinitis with polyps, and asthma (*Id.*).   Dr. Ahmed's plan included Bactrim, Tylenol, incision, drainage, and culture of the pustule left axil; dressing changes every day by a nurse; a follow-up in four days; Incruse Ellipta inhaler (a bronchodilator); Advair (combination corticosteroid and bronchodilator to treat asthma); and Aleveso (corticosteroid used to treat asthma) (*Id.*).   Dr. Ahmed discontinued Advair and Alvesco, and prescribed AirDuo (a bronchodilator) on March 7, 2018 (Doc. 126-1 at ¶ 43; *see* Doc. 130-1 at 99).   On April 10, 2018, Plaintiff saw a nurse for an upper respiratory infection and complained that the AirDuo caused blisters and discoloring of his tongue (Doc. 126-1 at ¶ 45; *see* Doc. 130-1 at 100-01).   Plaintiff refused another issuance of the AirDuo inhaler, and the nurse referred Plaintiff to a doctor (*Id.*).

Plaintiff saw a nurse practitioner on April 11, 2018 for complaints of congestion (Doc. 126-1 at ¶ 46; *see* Doc. 130-1 at 102).   The nurse practitioner noted nasal polyps bilaterally almost fully blocking Plaintiff's nasal passages (*Id.*).   The nurse practitioner also noted Plaintiff's throat was red, there was erythema and swelling in the right ear, a cloudy/bulgy tympanic membrane in the left ear, and inspiratory and expiratory wheezing (*Id.*).   The nurse practitioner's assessment was serous otitis, otitis media (fluid in the ear), bronchitis, sinusitis, pharyngitis and nasal polyps (*Id.*).   She ordered Augmentin for 10 days, Tylenol 325 milligrams for ten days, Prednisone for ten days, Claritin for one month, Nasacort for one month, and wanted Plaintiff to follow-up in two weeks (*Id.*).   Plaintiff saw Dr. Ahmed on April 26, 2018 for complaints related to mucous in his lungs, wheezing, and shortness of breath (Doc. 126-1 at ¶ 47; *see* Doc. 126-1 at 415).   Dr. Ahmed prescribed Alvesco, two puffs twice a day for six weeks, and DuoNeb twice a day for four weeks (*Id.*).   Plaintiff was to return to the clinic in one week (*Id.*).   Plaintiff was seen by a nurse practitioner for a follow-up on May 3, 2018 (Doc. 126-1 at ¶ 48; *see* Doc. 126-1 at 416).   Plaintiff

reported he had finished his antibiotics and Prednisone, and he had not received the Alvesco (*Id.*). Plaintiff reported he was still coughing up mucus and having nasal congestion (*Id.*).   The nurse practitioner planned to get Plaintiff the Alvesco as previously ordered, start Levaquin (antibiotic) for five days, Prednisone for 10 days, and complete a chest x-ray (*Id.*).   Plaintiff was to follow-up in two weeks with his chest x-ray results (*Id.*).   At his follow-up with the nurse practitioner on May 17, 2018, the NP charted that Plaintiff's chest x-ray showed no acute active pulmonary disease (Doc. 126-1 at ¶ 49; *see* Doc. 126-1 at 419).   On examination, Plaintiff's lungs were clear, nothing was present in his throat, and he had nasal polyps (*Id.*).   The nurse practitioner found Plaintiff had seasonal allergies, asthma, nasal polyps, and a normal chest x-ray (*Id.*).   Plaintiff was to take Claritin for 12 months, Meclizine for 12 months, and Nasacort for 12 months, and follow-up as needed (*Id.*).

Plaintiff was seen by the nurse practitioner for his complaints of nasal polyps on June 29, 2018 (Doc. 126-1 at ¶ 51; *see* Doc. 126-1 at 421).   The nurse practitioner charted that "[b]ilateral nasal polyps now completely blocking both nares. [Inmate] currently unable to breath through his nose."   Her assessment was nasal polyps and sinusitis.   Her plan was Augmentin, refer to ENT for severe nasal polyps, and follow-up after referral goes to collegial (*Id.*).

Dr. Ahmed presented Plaintiff's case in collegial review with Dr. Neil Fisher on July 5, 2018 following a referral requested submitted by the nurse practitioner (Doc. 126-1 at ¶¶ 52-53; *see* Doc. 126-1 at 422).   Dr. Fisher approved Plaintiff for an ENT evaluation, and Plaintiff was seen on July 23, 2018 by Dr. Charly Nguyen, an ENT, who recommended bilateral endoscopic sinus surgery (Doc. 126-1 at 53-54).   Dr. Nguyen performed surgery to remove Plaintiff's nasal polyps on August 24, 2018 (Doc. 126-1 at ¶ 62).   Dr. Ahmed saw Plaintiff on August 28, 2018, and indicated Plaintiff was to be seen for a follow-up from the nasal polypectomy in three weeks

(Doc. 126-1 at ¶ 64; *see* Doc. 126-1 at 439).   Plaintiff's case was presented in collegial review by Dr. Ahmed for an ENT follow-up post sinus surgery on September 13, 2018 (Doc. 117-1 at ¶ 14; *see* Doc. 117-2 at 3).   An agreed alternative treatment plan was developed to re-evaluate Plaintiff onsite and re-present if necessary (*Id.*).   Dr. Ahmed saw Plaintiff again on September 14, 2018 to address Plaintiff's complaints of ear and nose congestion, impaired hearing, and "asthma wheezing" (Doc. 126-1 at ¶ 65; *see* Doc. 126-1 at 442).   Dr. Ahmed's assessment was status post-nasal polypectomy, allergic rhinitis, and chronic asthma not well controlled (*Id.*).   Dr. Ahmed's plan was to restart Plaintiff's medications and prescribe AirDuo, one puff twice a day for 12 weeks (*Id.*).   Dr. Ahmed counseled Plaintiff about the recurrence of nasal polyps if he did not use his medication (*Id.*).

Plaintiff testified that his medical treatment for his nasal polyps was inadequate because he was consistently prescribed the same medication that was ineffective in addressing his complaints and condition (Deposition of Treondous Robinson, Doc. 132 at 8-9, 11, 12-13).   Plaintiff reiterated this point in his Declarations in response to the motions for summary judgment, asserting the medications he was prescribed to treat his nasal polyps did not provide consistent relief and, as a result, his polyps aggravated his asthma and caused hyper-extension of his lungs (Doc. 133 at 4).   Plaintiff also asserts he complained to Dr. Ahmed about being over-prescribed Prednisone due to its negative side effects (*Id.*).   Plaintiff attributes his recent diagnosis of high blood pressure to his over-usage of Prednisone (*Id.* at 5).   Plaintiff testified that Dr. Pittman told him that the reason he was diagnosed with high blood pressure was because of the over-usage of Prednisone (Doc. 132 at 25).   Plaintiff also attributes his suffering from a partially collapsed lung during a severe asthma attack in January 2019 to years of ineffective and inadequate treatment for his nasal polyps (Doc. 133 at 6).   At his deposition, Plaintiff testified that complications related to

his polyps and asthma led him to "continually putting pressure having to only breathe out of [his] mouth," which "added pressure on [his] lungs which ultimately caused a partial lung collapse" (Doc. 132 at 24).   Plaintiff also testified that no one has told him any delay in receiving surgery to remove his nasal polyps led to his 2019 asthma attack (*Id.* at 25).

### Plaintiff's Grievances[2] and Requests for Medical Treatment

Plaintiff submitted a grievance dated June 5, 2017, complaining of ineffective medication for his sinus infection (*see* Doc. 130-2 at 27-28).   Plaintiff requested to be seen by an Ear, Nose and Throat doctor (ENT).   In responding to this grievance, the counselor contacted the healthcare unit administrator (HCUA), Defendant Cunningham, who indicated," [a]s documented in the medical chart, [Plaintiff] has been seen and treated by licensed Illinois physician within the community standards of care."   The Grievance Officer recommended that this grievance be denied on September 13, 2017, and it appears Defendant Warden Lamb concurred in the denial on September 14, 2017 (*see* Doc. 130-2 at 25).   This grievance was received by the Administrative Review Board ("ARB") on October 6, 2017, and Defendant Benton returned the grievance without a decision on the merits finding Plaintiff failed to submit the grievance within the required timeframe (*see* Doc. 130-3 at 5).

In a grievance dated June 12, 2017, Plaintiff writes he is submitting the same directly to the ARB because numerous grievances submitted about his medical treatment have not received any

---

[2] Plaintiff and Defendants Brookhart, Baldwin, Cunningham, Lamb, Kink, and Benton submitted numerous grievances purportedly written and submitted by Plaintiff.   Grievances and other written correspondence to IDOC officials are inadmissible hearsay and cannot be used to support the truth of what is contained in them.   *See Heard v. Shicker*, 2018 WL 11272881, at *2 (C.D. Ill. April 23, 2018).   No party has sought to strike the grievances from the record, and both parties have attached grievances to their briefs and relied on the same in their arguments.   To the extent the grievances are used for a non-hearsay purpose, the Court will consider them when addressing Defendants' motions for summary judgment.   However, if it appears based on the parties' arguments that the grievances are being used only to prove the truth of the matter asserted, the Court will not consider the grievance as evidence.

response from his institution (*see* Doc. 134 at 96-97).   Defendant Benton returned this grievance without a decision on the merits, advising Plaintiff to submit a copy of the Grievance Officer's and CAO's responses (*see id* at 98).

Plaintiff submitted an emergency grievance on June 29, 2017 complaining of ineffective and insufficient medical treatment (*see* Doc. 114-15).   Plaintiff asserts he cannot breathe out of his nose and indicates he is "constantly congested."   Plaintiff also asserts he went to the healthcare unit on June 20, 2017 for shortness of breath, and was provided a breathing treatment that only offered short-lived relief.   Warden Lamb found an emergency was not substantiated on June 30, 2017 (*see id.*).   This grievance was received by the ARB on July 7, 2017, and was returned without a decision on the merits (*see* Doc. 134 at 116).   Plaintiff was directed to provide a copy of his counselor, grievance officer, and warden's response.   The ARB's response was signed by Defendant Benton.

Plaintiff submitted another grievance on July 6, 2017 complaining of "negligent medical attention and treatment" for his sinus infection (*see* Doc. 130-2 at 17-18).   Plaintiff requested medical attention at an outside hospital medical facility, and he indicated he wanted to be seen by an ENT.   The counselor again contacted Defendant Cunningham in responding to this grievance, who indicated, "As documented in medical chart, [Plaintiff] has been seen and treated and continues to have follow-up appointments with licensed Illinois physician within community standards of care."

Plaintiff also submitted a grievance on July 29, 2017, wherein he complains of nasal polyps and not being able to breathe (*see* Doc. 130-2 at 8-9.   On August 1, 2017, the counselor responded that, per HCUA Cunningham, "[Plaintiff] has been seen and treated by licensed Illinois physician within community standards of care. [Plaintiff] has scheduled follow up appointments with

providers."   On September 27, 2017, the Grievance Officer emailed Defendant Cunningham and indicated he was following up on this grievance dated July 29, 2017 (*see* Doc. 130-2 at 16).   The Grievance Officer asked if Plaintiff had any follow-up appointments for his sinus infections/polyps.   Defendant Cunningham reviewed Plaintiff's chart and emailed back a summary of Plaintiff's treatment from August 2017 through September 2017 (*see* Doc. 130-2 at 15).   On September 27, 2017, the Grievance Officer recommended that the grievance be denied, and Defendants assert a signatory for Warden Lamb concurred in the denial of the grievance on October 2, 2017 (*see id.* at 10).   Defendants did not provide an affidavit or any other evidence to demonstrate that a signatory for Lamb, rather than Lamb himself, signed this grievance.   This grievance was received by the ARB on October 18, 2017, and Defendant Benton returned the grievance without a decision the merits finding it did not meet "DR 504-810" (*see* Doc. 130-3 at 1).

An emergency grievance submitted by Plaintiff on September 13, 2017 concerning his sinus infections and nasal polyps was found not be of an emergency nature by Defendant Lamb on September 15, 2017 (*see* Doc. 134 at 107).   Plaintiff appealed Lamb's decision to the ARB, and Benton returned the grievance without a decision on the merits finding the issue had already been addressed, and advising Plaintiff he needed to provide a copy of the Grievance Officer's and CAO's responses (*see id.* at 134).

Plaintiff submitted a grievance on September 22, 2017, wherein he complains that he had to pay a copay, and he asks to be referred to an ENT (*see* Doc. 130-2 at 2-3).   The counselor responded to this grievance on October 23, 2017, explaining that co-pays are required (*see* Doc. 130-2 at 2).   On November 17, 2017, the Grievance Officer recommended that this grievance be denied (*see id.* at 4).   The Grievance Officer explained that, per HCUA, "As documented in

medical chart: [Plaintiff] has been seen and treated by licensed Illinois Physician within the community standards of care. [Plaintiff] has been presented in Collegial Review and alternative treatment plan has been implemented."   Warden Lamb concurred with the Grievance Officer's recommended denial on November 22, 2017 (*see id.*).   The ARB received this grievance on December 19, 2017, and Defendant Benton denied it on January 8, 2017, finding it was appropriately addressed by facility administration (*see* Doc. 130-3 at 28).   John Baldwin concurred with that denial on January 10, 2018 (*see id.*).

Plaintiff submitted an emergency grievance on February 9, 2018, complaining that his requests for medical treatment have been ignored (*see* Doc. 130-3 at 26-27).   Plaintiff complains about issues with his asthma and nasal polyps.   Defendant Warden Kink reviewed this grievance on February 14, 2018, and found an emergency was not substantiated (*see id.* at 26).

Plaintiff filed three grievances in April 2018 complaining about ineffective and inadequate treatment for his nasal polyps that are affecting "multiple parts of [his] body" and exacerbating his lung and asthma issues (*see* Doc. 134 at 120-125).   The Grievance Officer recommended that the grievance be denied, and the CAO concurred (*see id.* at 126).   Plaintiff appealed to the ARB, and Benton denied the grievances on June 12, 2018, finding the issues were appropriately addressed by the facility administration (*see id.* at 127).   Defendant Baldwin concurred with Benton on June 13, 2018 (*see id.*).

Another grievance was submitted by Plaintiff on December 30, 2018 in which he complains about the medical treatment he received for his asthma, and asks to be examined by an asthma/lung specialist and transferred to Dixon Correctional Center (*see* Doc. 134 at 91-92).   On March 5, 2019, the counselor responded that, per HCUA Cunningham, "[Plaintiff] has been seen and treated by licensed Illinois providers within the community standards of care.   Continue

current meds as ordered." The Grievance Officer recommended that this grievance be denied, and the CAO concurred on April 2, 2019[3] (*see* Doc. 134 at 93). On April 16, 2019, Benton denied the grievance on behalf of the ARB, finding it was appropriately addressed by the facility administration (*see id.* at 94). IDOC Director Baldwin concurred on April 18, 2019 (*see id.*).

On January 15, 2019, Plaintiff submitted an emergency grievance concerning his asthma and complained he was provided ineffective medical treatment for the same (*see* Doc. 134 at 65-66). CAO Brookhart determined Plaintiff's complaints were of an emergency nature and expedited the grievance for review (*see id.* at 65). The Grievance Officer recommended that the grievance be denied, indicating that "Per HCUA Cunningham," Plaintiff "has been seen and treated by licensed Illinois provider within the community standards of care." The Grievance Officer also included the medical treatment Plaintiff had received from January 2, 2019 through January 15, 2019 (*see id.* at 67). The CAO[4] concurred with the Grievance Officer on January 23, 2019, and Benton, on behalf of the ARB, found the grievance had been appropriately addressed by the facility administration (*see id.* at 68). Baldwin concurred with Benton on February 9, 2019 (*see id.*).

Plaintiff submitted a grievance on April 15, 2019 complaining that he had not received his Breo as prescribed (*see* Doc. 134 at 57). The counselor responded on May 1, 2019 that "per HCU," Plaintiff had been seen and treated by a licensed Illinois provider within the community standards of care. The Grievance Officer recommended that the grievance be denied, and the

---

[3] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 93).

[4] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 67).

CAO[5] concurred on May 14, 2019 (*see id.* at 58).   Plaintiff appealed this decision to the ARB, and Benton, on behalf of the ARB, found the issue was appropriately addressed by the facility administration (*see id.* at 59).   IDOC Director Jeffreys concurred on July 3, 2019.

On May 12, 2019, Plaintiff submitted an emergency grievance in which he complained that he did not receive his Breo as prescribed for his asthma (*see* Doc. 134 at 49-50).   The CAO[6] found Plaintiff's complaints were of an emergency nature and expedited review of the grievance. The Grievance officer recommended that the grievance be denied, indicating that per HCUA Cunningham, Plaintiff "has received all prescribed medications as ordered by licensed Illinois provider." (*see* Doc. 134 at 51).   The CAO[7] concurred with the Grievance Officer, and Benton, on behalf of the ARB, found this grievance had been appropriately addressed by the facility administration (*see id.* at 52).

Plaintiff submitted an emergency grievance on May 26, 2019, wherein he asserts he went to the healthcare unit to obtain his Breo, but was told it had not arrived.   Plaintiff complains that he needs his Breo inhaler to control his asthma because he had a near fatal asthma attack on January 8, 2019 (*see* Doc. 134 at 45-46).   The CAO[8] found the grievance was an emergency, and expedited it for review (*see id.* at 45).   The Grievance Officer recommended that the grievance be denied, citing HCUA Cunningham's representation that Plaintiff "has been administered prescribed medication as ordered by licensed provider specifically BREO last issued on 5/12/19, 5/25/19, and 6/2/19" (*see id.* at 47).   The CAO, whom Plaintiff asserts was Brookhart, agreed with

---

[5] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 58).

[6] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 49).

[7] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 51).

[8] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 45).

the Grievance Officer's recommendation on June 17, 2019 (*see id.*).  Benton, on behalf of the ARB, found the issue was appropriately addressed by the facility administration and IDOC Director Jeffreys concurred on July 10, 2019 (*see id.* at 48).

Plaintiff submitted an emergency grievance on June 30, 2019, wherein he complains that he went to the healthcare unit on June 28 and June 30, 2019 to receive a refill of his prescribed medication, but was not provided his Breo inhaler as prescribed (*see* Doc. 134 at 53-54).  The CAO[9] determined the grievance was of an emergency nature and expedited review of the same. The Grievance Officer recommended that the grievance be denied, citing that per HCUA Cunningham, "[Plaintiff] has received all prescribed medications as ordered by licensed Illinois provider" (*see id.* at 55).  The CAO concurred in the denial, and Plaintiff appealed the grievance to the ARB (*see id.* at 55-56).  Defendant Benton responded to the grievance on behalf of the ARB, finding it was appropriately addressed by the facility administration (*see id.* at 56).  IDOC Director Jeffreys concurred with Benton (*see id.*).

At his deposition, Plaintiff testified that he never had any in-person interactions with Kevin Kink, the Warden of Lawrence from February 2018 to December 2018, John Baldwin, the Acting Director of the IDOC, Sherry Benton, the chairperson of the ARB, or Lorie Cunningham, the Healthcare Unit Administrator, (Doc. 132 at 29, 31, 33-34).  There is also no evidence in the record that Plaintiff had personal conversations with Dee Dee Brookhart, the Warden of Lawrence from January 2019 to present, or Nicholas Lamb, the Warden of Lawrence from October 2016 to February 2018.

---

[9] Plaintiff asserts Defendant Brookhart signed as the CAO on this grievance; however, it is not clear from the signature who signed this document (*see* Doc. 134 at 53).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

### Count One – Eighth Amendment Deliberate Indifference Claim against Dr. Ahmed

Plaintiff asserts Dr. Ahmed was deliberately indifferent in treating his nasal polyps and sinus infections with medication that was ineffective, and in failing to refer Plaintiff to an outside specialist. Dr. Ahmed asserts he is entitled to summary judgment because Plaintiff cannot establish that Dr. Ahmed exhibited deliberate indifference to Plaintiff's serious medical needs. Dr. Ahmed also asserts he is entitled to qualified immunity.

The Supreme Court has recognized that "deliberate indifference to serious medical needs

of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference.

Page **18** of **27**

*Greeno*, 414 F.3d at 653.   A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs."   *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

   In this instance, Dr. Ahmed has not set forth any argument that Plaintiff's nasal polyps and sinus infections did not constitute a serious medical need within the meaning of the Eighth Amendment.   As such, the Court finds this point conceded for purposes of the motion at hand.

   With regard to Plaintiff's allegations of deliberate indifference, Dr. Ahmed asserts he listened to Plaintiff's complaints, examined Plaintiff, and exercised his medical judgment in conservatively treating Plaintiff's conditions with a variety of medications.   Dr. Ahmed contends his treatment of Plaintiff was reasonable because the prescribed medications could have reduced Plaintiff's symptoms, including shrinking his nasal polyps.   Dr. Ahmed also asserts he did not persist in an ineffective course of treatment as he prescribed a variety of medications in a variety of combinations.

   While the Court acknowledges Plaintiff's contention that Dr. Ahmed continued to prescribe ineffective medication and should have sent him to an outside specialist sooner, the Court agrees with Dr. Ahmed that he was not deliberately indifferent to Plaintiff's nasal polyps and sinus infections.   Indeed, the record demonstrates Plaintiff first saw Dr. Ahmed for complaints related to nasal polyps on June 6, 2017.   Plaintiff was ultimately referred to an ENT for evaluation in July 2018, just thirteen months later.   In this time, Dr. Ahmed saw Plaintiff at least eight times, and prescribed various medications, including nasal sprays, inhalers, Prednisone, Claritin, Sudafed, and Nasacort, in varying combinations.   Moreover, Dr. Ahmed first sought a referral to an ENT in August 2017, just two months after he was involved in Plaintiff's care.

Following this initial denial of the ENT referral request, an alternative treatment plan was adopted and Dr. Ahmed continued to treat Plaintiff's condition and complaints with various treatment regimens.

While Plaintiff clearly disagrees with Dr. Ahmed's course of treatment, and is apparently frustrated by the difficulties met in immediately ameliorating his condition, it is well-established that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).   Making such a showing is not easy as "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles*, 771 F.3d at 409 (quoting *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (other quotation omitted)).   In other words, federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.   *Pyles*, 771 F.3d at 409 (citations omitted).

There is no evidence that Dr. Ahmed's prescribed course of treatment was "blatantly inappropriate."   Rather, the evidence demonstrates that Dr. Ahmed examined Plaintiff multiple times and prescribed various medications in various combinations in an attempt to treat his complaints.   Although such treatments did not provide the immediate relief Plaintiff sought, the record fails to demonstrate that such lack of success was the result of Defendant Dr. Ahmed's deliberate indifference.   Further, Plaintiff has not set forth any evidence to dispute Dr. Ahmed's assertion that the first course of treatment for nasal polyps is medication, and that conditions that

Page **20** of **27**

cause polyps require long-term treatment and may be difficult to manage.

Also, while the Court acknowledges Plaintiff's attempt to associate Dr. Ahmed's purported failure to adequately treat his nasal polyps with his subsequent diagnosis of high blood pressure, lung collapse, and January 2019 asthma attack, Plaintiff has not presented sufficient evidence to substantiate his claims.   Indeed, to succeed on a claim of delayed treatment, a plaintiff must place in the record "verifying medical evidence" that "establish[es] the detrimental effect of the delay in medical treatment." *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (quotation omitted).   The Seventh Circuit has explained that "expert testimony that the Plaintiff suffered because of a delay in treatment" qualifies as verifying medical evidence. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (quoting *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007)). On the other hand, evidence, such as a medical record "of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id.*   Here, Plaintiff has provided no verifying medical evidence that would permit a jury to find that any delay in his medical treatment attributable to Dr. Ahmed caused his high blood pressure, lung collapse, or January 2019 asthma attack.   Indeed, Plaintiff testified that no one has told him any delay in receiving surgery to remove his nasal polyps led to his 2019 asthma attack, and Plaintiff's testimony that Dr. Pittman told him his high blood pressure was caused by an overuse of Prednisone is not only inadmissible hearsay, it requires multiple inferences to link Dr. Ahmed to the condition complained of and is far too tenuous for any reasonable jury to find Dr. Ahmed acted with deliberate indifference in treating Plaintiff's conditions at issue in this lawsuit.   For these reasons, Dr. Ahmed is entitled to summary judgment.

As a final note, the Court finds that although it need not consider Dr. Ahmed's qualified

immunity argument, having found Dr. Ahmed did not act with deliberate indifference, it would be remiss in failing to state that such an argument is futile as the Seventh Circuit has clearly stated that "private prison employees are barred for asserting qualified immunity from suit under § 1983." *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014).

**Counts Two and Three – Eighth Amendment Deliberate Indifference Claims against Cunningham, Lamb, Benton, Kink, Baldwin, and Brookhart**

Plaintiff asserts Defendants Cunningham, Lamb, Benton, Kink, Baldwin, and Brookhart were deliberately indifferent in failing to intervene in Plaintiff's treatment for his nasal polyps and sinus issues after receiving notice of his complaints concerning his medical treatment for the same. More specifically, Plaintiff argues Defendants are the "final frontier" in receiving notice and having an opportunity to rectify issues brought to their attention.   Plaintiff asserts these Defendants had a responsibility to use their authority to address the pain and suffering they were made aware of through Plaintiff's grievances.

Defendants assert summary judgment in their favor is warranted because they did not have sufficient personal involvement in Plaintiff's medical care to be held liable under § 1983. Defendants also assert that they were not deliberately indifferent to Plaintiff's medical needs as the grievances submitted by Plaintiff were adequately investigated.   Finally, Defendants contend they are entitled to qualified immunity.

Defendants are correct that liability under § 1983 is predicated on a defendant's personal involvement in the alleged constitutional violation, *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (citations omitted), and that to be personally responsible, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye."   *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)

(citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).   Defendants are also correct that prison officials "who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."   *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).   However, the Seventh Circuit has also made clear that an inmate's correspondence to a prison administrator may establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation.   *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015).   Indeed, "once an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard."   *Id.* at 782.   As stated simply by the Seventh Circuit, "prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference."   *Id.* (quoting *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997)).

Here, in viewing the evidence in the light most favorable to Plaintiff, the Court finds Defendants Cunningham, Lamb, Kink, and Brookhart were all notified, through the grievance process, of Plaintiff's complaints regarding his medical treatment while at Lawrence for the medical conditions at issue in this lawsuit.   These Defendants, however, did not act with deliberate indifference to an excessive risk to Plaintiff's health or safety.   Indeed, in the numerous grievances in the record, it is apparent that Plaintiff's grievance complaints were investigated and often responded to with the input of the healthcare unit administrator who delineated the medical treatment Plaintiff had received.   Indeed, in responding to Plaintiff's grievances dated June 5, 2017, July 6, 2017, July 29, 2017, September 22, 2017, April 3, 2018, December 30, 2018, January 15, 2019, April 15, 2019, May 12, 2019, May 26, 2019, and June 30, 2019, responding officials sought and received input from HCUA Cunningham or the Director of Nursing with regard to the medical care Plaintiff had received.   Defendants Cunningham, Lamb, Kink, and Brookhart were

entitled to defer to the judgment of Plaintiff's treating physicians, and it was apparent Plaintiff was being seen by a medical provider on a regular basis.   *See King v. Kramer*, 680 F.3d 1013, 1018 (nonmedical personnel are entitled to defer to the judgment of health professionals so long as they do not ignore the prisoner).   With regard to the few grievances that did not receive direct input from a HCUA or DON as to Plaintiff's current medical treatment, Defendants did not ignore the issue; rather, they responded to the grievances in an appropriate manner.   Finally, the Court finds that Defendants Benton and Baldwin are far too removed to find any personal liability based on their responses to Plaintiff's grievances.   These Defendants' involvement in addressing Plaintiff's complaints was limited to their ARB-level review of his grievances, and it appears they processed and responded to the grievances in the course of business and this limited involvement in Plaintiff's complaints is not sufficient to hold them personally liable for the constitutional deprivations alleged by Plaintiff.

For these reasons, Defendants Cunningham, Lamb, Benton, Kink, Baldwin, and Brookhart are entitled to summary judgment[10].

### Count Four – Eighth Amendment Deliberate Indifference Claim against Dr. Ritz

Plaintiff asserts Defendant Dr. Ritz was deliberately indifferent in not referring Plaintiff to a specialist for his nasal polyps and sinus infections.   Dr. Ritz contends summary judgment in his favor is warranted because he provided Plaintiff with appropriate care and was not deliberately indifferent to Plaintiff's needs.   Dr. Ritz also asserts Plaintiff did not suffer any harm as a result of Dr. Ritz not sending Plaintiff to a specialist for treatment for his nasal polyps and sinus infections.

As set forth above, the Supreme Court has recognized that "deliberate indifference to

---

[10] The Court need not address Defendants' argument on qualified immunity as it has found Defendants were not deliberately indifferent in violation of the Eighth Amendment.

serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted). Similar to the discussion concerning Dr. Ahmed, the Court focuses its attention on the second prong, determining whether Dr. Ritz "acted with a sufficiently culpable state of mind," as Dr. Ritz did not argue that Plaintiff's medical condition was not a serious medical need.

The undisputed record demonstrates that Dr. Ritz was involved in Plaintiff's care on three occasions prior to Plaintiff being referred to an ENT for evaluation and surgery. First, in March 2016, Dr. Trost and Dr. Ritz discussed Plaintiff's case in collegial review upon Dr. Trost's request for an ENT consultation for chronic sinusitis. Dr. Trost's request for a referral was denied, and additional information, including Plaintiff's current medications and symptoms were to be submitted upon re-presentation. Plaintiff's case was not referred for a collegial review again until August 2017. The Court finds that Dr. Ritz's denial of the ENT referral request in March 2016 was clearly not evidence of deliberate indifference. Dr. Ritz sought additional information prior to approving the request, and no additional information was received.

With regard to the collegial review denials in August and September 2017 sought by Dr. Ahmed, the Court also finds Dr. Ritz's actions did not amount to deliberate indifference. Although the Court recognizes that by August and September 2017 Dr. Ritz was or should have been aware of the longevity of Plaintiff's sinus issues, his decisions regarding Plaintiff's medical treatment were not deliberately indifferent to the same. First, Plaintiff has not set forth any evidence to dispute the assertion that the first course of treatment for nasal polyps is medication,

and that conditions that cause polyps require long-term treatment and may be difficult to manage. Moreover, in August and September 2017, Dr. Ritz and Dr. Ahmed adopted an alternative treatment plan that consisted of directly observed therapy to verify adherence and to monitor for effectiveness.   While there is a dispute as to whether the directly observed therapy was implemented and whether Plaintiff adhered to his medication regimen, these issues are not material to the finding that Dr. Ritz did not act with deliberate indifference.   Similar to Dr. Ahmed, Dr. Ritz's actions were evidence of utilizing the first line of treatment for nasal polyps and assessing whether these medications would treat Plaintiff's condition.   It was not deliberate indifference for Dr. Ritz to ensure that the medication regimen meant to treat Plaintiff's condition was adhered to, and whether the institution implemented the plan was not in Dr. Ritz's control. Accordingly, the Court finds no reasonable jury could find that Dr. Ritz's decisions in March 2016, August 2017, and September 2017 regarding Plaintiff's medical care amounted to deliberate indifference.

Also, with regard to Plaintiff's contention that Dr. Ritz's actions resulted in complications that aggravated Plaintiff's asthma, the Court applies the same reasoning and decision as it did above with regard to Dr. Ahmed.   Plaintiff has again failed to present sufficient evidence to substantiate his claims as there is no verifying medical evidence that would permit a jury to find that any delay in Plaintiff's medical treatment attributable to Dr. Ritz caused his high blood pressure, lung collapse, or January 2019 asthma attack.

For these reasons, Dr. Ritz is entitled to summary judgment.

## <u>Conclusion</u>

Based on the foregoing, the Motion for Summary Judgment filed by Dr. Stephen Ritz (Doc. 116), the Motion for Summary Judgment filed by Faiyaz Ahmed, MD (Doc. 125), and the Motion

for Summary Judgment filed by Dee Dee Brookhart, John Baldwin, Lorie Cunningham, Nicholas Lamb, Kevin Kink, and Sherry Benton (Doc. 129) are **GRANTED**.

 The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff and close this case.

**IT IS SO ORDERED.**

**DATED: May 2, 2022**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**
